UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

|  |  |  |
|---|---|---|
| IN RE: SAFETY-KLEEN ROLLINS LITIGATION | ) ) ) ) ) ) ) | C/A No. 3:00-1343-JFA<br><br>Order Denying<br>Motion to Appear<br>Pro Hac Vice<br>(Daniel J. Hurson) |

This matter came before the court for hearing on August 15, 2005 for consideration of the Motion to Appear *Pro Hac Vice* [doc no. 449] filed by Daniel S. Haltiwanger on behalf of Daniel J. Hurson on July 19, 2005. For the reasons stated herein, that motion is denied.

I.   Factual and Procedural Background

On January 31, 1997, the board of directors of Rollins Environmental Services, Inc. ("Rollins") unanimously approved the purchase of Laidlaw, Inc.'s ("Laidlaw") environmental waste subsidiary, Laidlaw Environmental Services, Inc. ("Old LES"). John Rollins, Sr. was the Chairman and John Rollins, Jr. was the Vice-Chairman of the Rollins board. Rollins then issued a proxy statement (the "Rollins Proxy") in order to solicit shareholder support. The Rollins Proxy, dated April 30, 1997, was delivered to the Rollins shareholders on or about May 3, 1997. James R. Bullock ("Bullock") was the President and Chief Executive Officer of Laidlaw, and Michael Bragagnolo ("Bragagnolo") was then a

1

newly-hired Executive Vice-President of Old LES. Although Bullock's name appears in the Rollins Proxy, neither Bullock nor Bragagnolo signed the Rollins Proxy.

Ultimately, Laidlaw sold Old LES to Rollins, whereby Old LES and Rollins became Laidlaw Environmental Services, Inc. ("New LES"). In exchange for Old LES, Rollins gave the following consideration: (1) $400,000,000 in cash; (2) 120,000,000 shares of Rollins common stock valued at $330,000,000; (3) and a 5% Subordinated Convertible Pay-in-Kind Debenture due in 2009 in the principal amount of $350,000,000. Because Rollins transferred 120,000,000 shares of its stock to Laidlaw, the transaction resulted in Laidlaw becoming the majority shareholder of Rollins.

New LES subsequently acquired Safety-Kleen Corporation and changed its name to Safety-Kleen, Corp. ("Safety-Kleen"). On March 6, 2000, Safety-Kleen issued a press release informing the public of accounting irregularities. Shortly thereafter, PricewaterhouseCoopers ("PwC") issued a letter withdrawing its previously-issued audit reports on the financial statements of Safety-Kleen, New LES, and Old LES for fiscal years 1997, 1998, and 1999.

Plaintiffs are Rollins shareholders who originally filed this securities class action on May 1, 2000 against defendants Bullock, Bragagnolo, John W. Rollins, Jr. and the Estate of John W. Rollins, Sr. According to their Third Consolidated Amended Class Action Complaint, plaintiffs allege that Bullock, the only remaining defendant in this case, violated

§§ 14(a)[1] and 20(a)[2] of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78n and 78t(a).

### A.  KRISLOV FIRM AND NESS MOTLEY

By motion filed June 30, 2000, Walter E. Ryan, Jr. ("Ryan") moved the court to appoint him as lead plaintiff of the Rollins shareholder class and to approve his selection of Krislov & Associates, Ltd. (the "Krislov firm") as lead counsel and Ness, Motley, Loadholt, Richardson & Poole, P.A. ("Ness Motley") as liaison counsel for the class.  In support of his motion, Ryan submitted the Affidavit of Michael R. Karnuth, Esq. dated June 30, 2000, together with a memorandum in support of the motion.  In the memorandum, Ryan stated:

> [T]he proposed lead counsel, Krislov & Associates, Ltd., possesses extensive experience in the area of class actions and securities litigation and have successfully prosecuted numerous securities fraud actions on behalf of injured investors. See Affidavit of Michael R. Karnuth, Exhibit B, attached herewith. Thus, the Court may be assured that, in the event this motion is granted, the members of the class will receive a high caliber of legal representation.

(Ryan Memo, p.14).

The Karnuth Affidavit incorporated the following statements from the Krislov firm's resumé under the caption "The Firm's Experience in Complex Litigation":

---

[1] Section 14(a) states, in pertinent part: "It shall be unlawful for any person ... , in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security . . . "  15 U.S.C. § 78n(a).

[2] Section 20(a) states, in pertinent part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

3

> The Krislov firm has participated as counsel in dozens of class and derivative cases involving securities, antitrust, municipal finance, pension and consumer issues. 1. <u>Experience in Securities Litigation</u>. The firm's experience in securities class actions is extensive and includes litigating the exact claims at issue in this case – violations of sections 10(b) and 20 of the Securities Exchange Act and Rule 10(b)(5), as enhanced by significant unique experience in tax and valuation cases, in addition to the usual securities fraud cases.

(p.1, Exhibit B to Karnuth Affidavit attached to Ryan Memo).

The affidavit continues to state that the Krislov firm's "securities litigation experience" includes "[p]roven [l]eadership roles in [s]ecurities [a]ctions," and enumerates many actions in which the firm had been involved. The firm resumé even highlights that "[t]he standing of the Krislov firm in successfully conducting complex and class action litigation has been favorably noted by the courts." (*Id.* p. 6). Finally, the firm resumé states that "[i]n addition to a committed and talented organization of people, the firm has invested significantly in its infrastructure in preparation for large, complex litigation such as this." (*Id.* p. 11).

The Karnuth Affidavit also incorporated Ness Motley's resumé, which demonstrates its involvement "in a wide range of complex litigation" including appearances "in proceedings in virtually every state" and trials in "more than 25 states." Ness Motley's resumé enumerates involvement as lead/co-lead plaintiffs counsel or liaison counsel in some sixteen class and consolidated action cases which demonstrates the firm's "substantial experience in multiple party litigation." (Ness Motley resumé, attached to Karnuth Affidavit).

4

B.   STULL, STULL & BRODY

By motion filed July 18, 2000, Diane Gillmor, Paul E. Gillmor (on behalf of himself and his children) and Paul M. Gillmor (collectively the "Gillmor Group") moved the court to appoint the Gillmor Group as lead plaintiffs of the Rollins shareholder class and to approve its selection of Stull, Stull & Brody as lead counsel and Ness Motley as liaison counsel.  In support of its motion, the Gillmor Group submitted the Declaration of Aaron L. Brody, dated June 29, 2000, together with a memorandum in support of the motion.  In the memorandum, the Gillmor Group explained:

> [T]he lead plaintiff provisions of the PSLRA arose from Congress's concern that class action securities litigation had become a "lawyer-driven" enterprise in which law firms sought to bring cases and then sought out nominally interested plaintiffs in the hope of obtaining quick settlements.  See Zaltzman v. Manugistics Group, Inc., 1998 U.S. Dist LEXIS 22867, *11–12 (D. Md.) ("In passing PSLRA, Congress addressed a system marred by 'strike' lawsuits where the initiative for filing came 'almost entirely from the lawyers, [and] not from genuine investors.'"), citing Report on the Private Securities Litigation Reform Act of 1995, S. Rep. No. 67, 104th Cong., 1st Sess. 2 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 685.  Congress noted that in such lawyer-driven cases, "lawyers typically relied on repeat, or 'professional,' plaintiffs who, because they had a token number of shares in many companies, regularly lent their names to lawsuits." Id. at *12, citing S. Rep. No. 67, 104th Cong., 1st Sess. 2 (1995).

(Gillmor Memo, p.4–5).

In urging the court to appoint its selected law firm as lead counsel, Ryan submitted in the Brody Declaration:

> Stull, Stull & Brody has successfully litigated many securities class actions in federal and state courts over the past twenty-five years.  See Declaration of Aaron L. Brody, dated June 29, 2000, in Support of the Gillmor Group's

5

> Motion for Appointment as Lead Plaintiff and for Approval of Selection of Counsel at Exh. G (Brief Biography of Stull, Stull & Brody). These firms are well qualified to represent the Rollins Shareholder Class. Accordingly, the appointment of Stull, Stull & Brody as lead counsel and Ness, Motley, Loadholt, Richardson, & Poole, P.A. as liaison counsel for the Rollins Shareholder Class is proper.

(Brody Declaration, Exhibit to Gillmor Memo).

  C. AUGUST 2, 2000 HEARING ON APPOINTMENT OF LEAD COUNSEL

The court held a hearing on August 2, 2000 with plaintiffs' counsel, as well as counsel for defendants, regarding the motions for appointment of lead plaintiff and lead counsel. At the hearing, plaintiffs' counsel informed the court that they had "resolved" their competing motions for appointment of lead plaintiffs, and proposed to the court their joint motion by their respective clients as "co-lead plaintiffs" and themselves as "co-lead and liaison counsel." By order filed August 16, 2000, the court appointed Ryan and the Gillmor Group as co-lead plaintiffs for the Rollins shareholder class, appointed the Krislov firm and Stull, Stull & Brody as co-lead counsel, and appointed Ness Motley as liaison counsel.

Upon motion filed March 25, 2002 by Terry Richardson and Daniel Haltiwanger, the court on March 27, 2002 ordered the substitution of Richardson, Patrick, Westbrook & Brickman, LLC ("Richardson Patrick") for Ness Motley as liaison counsel. Although not admitted *pro hac vice*, Joseph H. Weiss of Weiss & Yourman began appearing as "additional counsel" listed on plaintiffs' memoranda at least by May 2002.

Against this background of an apparent four-law firm team of plaintiffs' attorneys, the court received the application for *pro hac vice* admission of Daniel J. Hurson on July 19,

2005, seven weeks before jury selection was scheduled to begin in this case that has been pending for five years. Plaintiffs first informed the court by way of their response filed August 11, 2005 in support of the *pro hac vice* motion that they intended for Hurson to be their "lead trial counsel."

II.     APPLICABLE LAW

The United States Court of Appeals for the Fourth Circuit has stated that "[i]t is well settled that permission to a non-resident attorney, who has not been admitted to practice in a court, to appear *pro hac vice* in a case there pending is not a right but a privilege, the granting of which is a matter of grace resting in the sound discretion of the presiding judge." *Thomas v. Cassidy*, 249 F.2d 91 (1957).

III.    DISCUSSION

    A.   DEFENDANT BULLOCK'S OPPOSITION TO HURSON'S *PRO HAC VICE* APPLICATION

By way of memorandum filed on August 8, 2005, Defendant Bullock opposes Hurson's *pro hac vice* application ("Bullock's Opposition"). Bullock argues that Hurson should not be admitted *pro hac vice* because he formerly represented Safety-Kleen while Bullock and Safety-Kleen shared a common litigation interest. Specifically, Bullock contends that Safety-Kleen and Bullock shared a litigation interest in showing that, to the extent that there were any errors in Safety-Kleen's financial statements, they were the result of the negligence of PwC. As a result of these shared interests, Bullock alleges his counsel and Safety-Kleen's counsel, including Hurson, worked cooperatively in the cases pending

before this court. Bullock's counsel states that the conversations that occurred would have been far different in tone and content had Bullock known that Hurson would later seek to "switch sides" and represent plaintiffs in this case. Bullock cites to *Kaskie v. Celotex Corp.*, 618 F.Supp. 696, 699 (N.D. Ill. 1985), for the presumption that when parties are co-defendants in a civil suit, they share confidences. To rebut this presumption, *Kaskie* provides that the party fighting disqualification must make a "clear and persuasive showing" that he did not obtain confidences regarding his former client's co-defendant. As applied to this case, Bullock argues that plaintiffs must make a clear and persuasive showing that Hurson did not obtain any confidential information relating to Bullock during the course of his representation of Safety-Kleen.

Bullock further argues that if Hurson were admitted *pro hac vice*, the fairness and integrity of these proceedings would be tainted, thus unfairly prejudicing Bullock. According to the affidavit of Bradley A. Carl, Assistant General Counsel and Vice President – Risk Management for Safety-Kleen Systems, Inc. (the company that emerged from the bankruptcy of Safety-Kleen Corp. and certain of its subsidiaries):

> Safety-Kleen engaged the law firm of Williams & Connolly, including Daniel Hurson of that firm, to represent it in 2000. Mr. Hurson, both while at that firm and after his departure from the firm, represented Safety-Kleen in numerous lawsuits arising out of Safety-Kleen's financial statements. For example, Mr. Hurson represented Safety-Kleen in prosecuting Safety-Kleen's claims against PricewaterhouseCoopers LLP (and defending against claims that PricewaterhouseCoopers LLP asserted against Safety-Kleen) in state court in South Carolina and Georgia. In addition, Mr. Hurson represented Safety-Kleen's interests in connection with its involvement in this and related cases, primarily with respect to responding to discovery requests. Mr. Hurson's

>representation of Safety-Kleen continued until approximately the late fall of 2004.
>
>In the course of his representation of Safety-Kleen, Mr. Hurson was given access to a large amount of confidential and privileged information. Safety-Kleen has not waived its privilege or claim of confidentiality with respect to that information, either for purposes of plaintiffs prosecuting their claims in this case or for any other purpose.
>
>Mr. Hurson did not contact me or, to my knowledge, anyone else at Safety-Kleen before submitting his pro hac vice motion to represent plaintiffs in this case. Safety-Kleen has not consented and does not consent to Mr. Hurson's representation of plaintiffs in this case.

(Affidavit of Bradley A. Carl, attached as Exhibit A to Bullock's Opposition).

Bullock argues that Hurson cannot participate in the trial of this case without in some way making use of privileged or confidential information he acquired from Safety-Kleen, and that there is no way for this court to monitor the problem. Additionally, Bullock points to another problem of Hurson's proposed representation in that former Safety-Kleen employees such as Henry Taylor or Jim Hattler will testify at trial. Bullock posits that presumably Hurson met with these and other potential witnesses in his capacity as Safety-Kleen's lawyer, and that presumably these witnesses shared privileged and confidential information with him. Bullock argues this creates a Catch-22 under the South Carolina Rules of Professional Conduct ("SCRCP") 1.7(b): Either Hurson satisfies his duty to his current clients and uses that information to cross-examine those witnesses (thereby breaching his duty to Safety-Kleen), or he satisfies his duty to his former client and does not use the information to cross-examine those witnesses (thereby breaching his duty to plaintiffs).

>Finally, Bullock argues the following:
>
>This case is now five years old. Less than two months before trial, plaintiffs sought to bring in a lawyer whose prior representation of Safety-Kleen creates an ethical minefield and whose participation in this case would be fundamentally unfair to Bullock. If plaintiffs' counsel thought they needed more assistance at trial, there are plenty of other capable lawyers, in Columbia and elsewhere, to choose from. Allowing Hurson to be that lawyer would run afoul of the ethical rules and considerations of fundamental fairness.

(Bullock's Opposition, p. 9.)

### B.  PLAINTIFFS' RESPONSE TO BULLOCK'S OPPOSITION TO *PRO HAC VICE* APPLICATION

By way of memorandum filed on August 11, 2005, plaintiffs responded to Bullock's Opposition to Hurson's *pro hac vice* application ("Plaintiffs' Response"). Plaintiffs characterize the issue before the court as whether Hurson is disqualified under the relevant disciplinary rules of South Carolina, notably SCRPC 1.9, which provides an attorney's duties to former clients:

>(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially similar matter in which that person's interests are materially adverse to the interests of the former client unless the client gives informed consent, confirmed in writing.

Specifically, plaintiffs say that since Safety-Kleen has not given its informed consent under SCRPC 1.9, the query is whether the present case is the same or substantially similar to the case in which Hurson represented Safety-Kleen, its case against PwC in the state court of South Carolina, and if so, whether the Rollins plaintiffs' interests "are materially adverse to [Safety-Kleen]." Attached to their memorandum is a Declaration by Hurson, in which he

10

addresses the "same or substantially similar" question. Plaintiffs argue that Bullock presents no argument to support the notion that the Rollins plaintiffs' interest is "materially adverse" to Safety-Kleen. On the issue of confidential information, the memorandum and Hurson's Declaration explains that it is very unlikely that the use of any such information as he may possess would "materially advance" the position of the plaintiffs. He points out that the vast amount of discovery provided by Safety-Kleen and the waivers it previously gave render the remaining universe of privileged information and/or documents negligible. Plaintiffs argue that "[w]hat remains left in Hurson's head, so to speak, would in large part be in the nature of 'general knowledge of the client's policies and practices' which, according to the Commentary to Rule 1.9, 'ordinarily will not preclude a subsequent representation.'" (Plaintiffs' Response, p. 6).

Plaintiffs argue that Safety-Kleen and Bullock never shared a common litigation interest, as Bullock contends, and that they were adversaries, if anything. Furthermore, Hurson asserts that he had no occasion to "cooperate" with Bullock's counsel other than on routine discovery matters wherein Hurson was facilitating, for all parties in all cases, the review of documents or arranging for depositions of company employees. (Hurson Declaration, ¶¶ 20-21).

Plaintiffs complain that the "fairness and integrity" of these proceedings are best preserved by denying a disqualification claim which it labels as "little more than a tactical maneuver by Bullock's counsel." (Plaintiffs' Response, p. 8). In couching the issue as a

disqualification motion, plaintiffs assert that Bullock has the heavy burden of showing sufficient grounds for disqualification. (*Id.*, p. 10).

Finally, plaintiffs note:

> The Court has considerable discretion here, but the burden of proof is clearly upon the party who seeks disqualification, a drastic remedy. If granted, Bullock's motion will deprive the plaintiffs of their chosen lead counsel less than a month before trial. Preserving "the fairness and integrity of these proceedings" demands that Bullock be required to meet his burden with demonstrable and persuasive evidence, or face a trial matching competent attorneys freely chosen by their respective clients.

(*Id.*, p. 11).

The plaintiffs' memorandum was submitted with the signature blocks of Richardson Patrick (as Liaison Counsel), Krislov & Associates, Stull Stull & Brody (as Co-Lead Counsel), and Weiss & Lurie (as Additional Counsel).

C.    THE AUGUST 15, 2005 HEARING ON MOTION FOR ADMISSION *PRO HAC VICE*

The court heard arguments of counsel on the pending *pro hac vice* motion at a hearing on August 15, 2004. When asked by the court why the plaintiffs need to bring somebody else onto the legal team after five years of litigation shortly before trial, plaintiffs' counsel, Michael Karnuth, responded:

> Your Honor, this is a very complex case, and Mr. Hurson has a vast amount of experience in litigating – in trying cases. We felt that it would be necessary to have an experienced counsel to convey to the jury, you know, some of these issues of fact and law – that are issues of fact that are complex, And we don't see that there is any prohibition against hiring trial counsel before the trial.

(Hearing transcript, p.3).

After the court revisited on the record the representations of counsel from five years ago about their individual firms' extensive experience in securities class actions, Mr. Karnuth assured the court that "[w]e stand behind our affidavit in what we submitted to the court. We do have extensive experience in class action and securities litigation," adding later that "most of these cases don't go to trial, we don't have the trial experience that Mr. Hurson has." (*Id.*, p.5). The court then inquired whether "the next time your firm gets a securities class action, are you going to tell the next judge the same thing, that you are qualified to do it, or are you going to say, 'We are qualified only up to a point, and after discovery is done, we need somebody to come in later'?" Mr. Karnuth responded that plaintiffs counsel has "gone way beyond discovery," having gone through discovery and summary judgment motions and litigated a lot of pretrial matters and "teed this case up" and now need somebody with Mr. Hurson's experience to assist in trying the case. (*Id.*, p.6).

The court then invited plaintiffs to argue the motion, to which Mr. Karnuth responded "It's Mr. Bullock's motion." (*Id.*, p.7). After some hesitance by the plaintiffs to claim the motion, Mr. Mattson responded that "[t]echnically it's their motion, and we filed an opposition to it, But I'm happy to step up to the podium and go first." (*Id.*, p.7). Mr. Mattson reviewed the salient points of their opposition brief, and the court invited the plaintiffs to present their side.

In an extraordinary move, the court allowed Mr. Hurson himself to argue the plaintiffs' position, though he had not yet been admitted *pro hac vice*. Mr. Hurson argued

13

for an extended period of time (*Id.*, pp. 16–28), before the court refocused the argument on the issue of Congress's concern, in enacting the PSLRA, about lawyer-driven, top-heavy cases in terms of litigation expenses and attorneys fees. Mr. Hurson argued that in his opinion, there would not be any additional fee as a result of his admission (*see id.* at p.29), and if anything, that his presence would help expedite this case (*see id.* at p.30).

D. ANALYSIS

Having thoroughly reviewed the memoranda filed on this motion, as well as those filed in support of the motions to be appointed as lead counsel in this case, the court denies the motion to be admitted *pro hac vice*. The motion before the court is the Motion to Appear *Pro Hac Vice* [doc no. 449] filed by Daniel S. Haltiwanger on behalf of Daniel J. Hurson on July 19, 2005. It is not a disqualification motion, as plaintiffs suggest. Although plaintiffs' arguments are posited in terms of their "right to choose their counsel," in this Circuit, permission to appear *pro hac vice* is a privilege, the granting of which is a matter of grace resting in the sound discretion of the presiding judge. *See Thomas, supra.*

The Krislov firm and Stull Stull & Brody, as individual firms competing for appointment as lead counsel, represented to the court that their firms individually were competent to represent the Rollins shareholder class as plaintiffs in this case. At their joint request, the court approved, with some reluctance, their appointment as co-lead counsel.

In a letter dated August 18, 2005, requesting reconsideration of the court's oral ruling denying the motion *pro hac vice*, plaintiffs attempt to couch Mr. Hurson's addition not as

14

additional co-lead counsel, but as an "additional member of the trial team." Plaintiffs implore the court that the selection of individual counsel should be left to lead plaintiffs, citing to a Ninth Circuit case which vacated an order appointing lead plaintiff and lead counsel, stating, "the district court has no authority to select for the class what it considers to be the best possible fee schedule. Indeed, the district court does not select class counsel at all." *Cavanaugh v. United States District Court for the Northern Dist. of Calif.*, 306 F.3d 726, 732 (9th Cir. 2002).

Mr. Karnuth points out that in its Order Consolidating the Actions, Appointing co-Lead Plaintiffs and Approving Selection of Co-Lead Counsel and Liaison Counsel ("Appointment Order"), this court stated:

> Co-Lead Counsel shall assume and exercise the following powers and responsibilities for the Rollins Security Holders Putative Class:
>
> * * *
>
> d.   To coordinate the selection of counsel to act as spokesperson at pre-trial conferences;
>
> * * *
>
> g.   To coordinate and direct the preparation for trial, and the trial of this matter, and to delegate work responsibilities to selected counsel as may be required.

In denying the motion *pro hac vice*, the court is not interfering with the plaintiffs' selection of individual counsel; plaintiffs have already selected their counsel, which the court approved five years ago. In contrast to the representation of plaintiffs counsel in its letter

15

that the court "gave us the right to select additional counsel where and when appropriate," the court's provision in subparagraphs d and g of its Appointment Order did not authorize plaintiffs to select additional counsel <u>outside</u> of their respective plaintiffs counsels' firms. Indeed, such an interpretation of the Appointment Order eviscerates the provisions of the PSLRA requiring the court to appoint lead counsel. The plaintiffs' citation to *Vincelli v. Nat'l Home Health Care Corp.*, 112 F. Supp. 2d 1309, 1319 (M.D. Fla. 2000) is likewise inapposite. In that case, the court expressly authorized the lead counsel to farm out work to other firms. That is not the case in this matter.

In their letter, plaintiffs counsel assured the court of their willingness and ability to try this case, noting that they are "certainly capable of trying the case without Mr. Hurson." Plaintiffs attempt to bolster their position by comparing the size of their firms to that representing defendant Bullock. The issue before the court is not one aimed at equalizing the comparative sizes of the parties' respective firms. Furthermore, in contrast to plaintiffs' choice of counsel, Bullock's choice of counsel is not a matter of interest under the PSLRA and does not require court approval.

Plaintiffs have been represented by qualified counsel who have been working on this case for five years. The motion before the court attempts to introduce new counsel at the eleventh hour to try the case. Given (a) Mr. Hurson's prior representation of Safety-Kleen, (b) Safety-Kleen's claim that Mr. Hurson was given access to a large amount of confidential and privileged information; and (c) Safety-Kleen's objection to Mr. Hurson's representation

of plaintiffs in this case, there is, at the very least, a question about the potential conflict of interest and propriety of Mr. Hurson's participation in this matter. Mr. Hurson himself concedes he recognized the potential conflict, as he stated in his affidavit that:

> Prior to accepting this engagement, I did a personal "due diligence" review regarding this engagement, to assure myself that I would have no conflict in undertaking this representation. I conferred with counsel for the plaintiffs, including experienced local South Carolina counsel, and fully disclosed my prior involvement with Safety-Kleen. The collective judgment of all counsel was that there would be no basis for my disqualification.

(Hurson Declaration, ¶ 6.)

However, due to the confidential and privileged nature of the information that Mr. Hurson allegedly obtained, it is difficult for anyone – defendants, the court, or Mr. Hurson himself – to police the use or disclosure of that information. Furthermore, if the court were incorrect in admitting Mr. Hurson *pro hac vice*, and is required to retry the case, there may be a taint that arguably cannot be taken away by virtue of his involvement in the case.

Responding to perceived abuses, Congress, in the PSLRA, altered the procedures for bringing class actions under the federal securities laws. Congress's principal focus, as reflected in the legislative history, was that plaintiff investors, and not their counsel, make the ultimate strategic decisions in litigation. *E.g.,* H.R.Rep. No. 104-369 at 32 (1995) *reprinted in* 1996 U.S.C.C.A.N. pp. 730, 731 (Lead Plaintiff provision designed to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs counsel.").

While the court cannot say, as a matter of law, that Mr. Hurson has a conflict of interest in this case, it can neither say, as a matter of law, that he does not. Given the irreparable harm that could result to defendant from an incorrect determination of Mr. Hurson's admission, the court finds the more prudent ruling is one that avoids the possibility of Safety-Kleen's confidential information flowing to plaintiffs. Considering Congress's concern, as distilled in the PSLRA, to curb litigation expenses and attorneys fees, the court finds it inappropriate to approve, at this late hour, Mr. Hurson's *pro hac vice* application. It strains credulity to not expect an increase in expenses to accompany Mr. Hurson's addition, if for no other reason than the fact that Mr. Hurson works out of a different city (Washington, D.C.) from those of co-lead counsels' firms (New York and Chicago) and from the place of trial (South Carolina).

For the foregoing reasons and in the court's discretion, the Motion to Appear *Pro Hac Vice* [doc. no. 449] is denied.

IT IS SO ORDERED.

August 19, 2005                                        /s/ Joseph F. Anderson, Jr.
Columbia, South Carolina                         United States District Judge